## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK
### CENTRAL ISLIP

| | |
|---|---|
| KEVIN O'ROURKE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>- against -<br><br>NESTLE USA INC.,<br><br>Defendant | 2:24-cv-01607<br><br><br>Class Action Complaint<br><br>Jury Trial Demanded |

Plaintiff Kevin O'Rourke ("Plaintiff") alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

## I.    MINERAL WATER

1.    Mineral water has risen dramatically in popularity for multiple reasons.

2.    First, its light carbonation makes it a suitable substitute for sugary carbonated soft drinks ("CSD").

3.    Second, mineral waters have unique flavors, owing to the geological process which creates them, based on different amounts and types of minerals.

4.    Third, mineral waters are known for their purity, originating at sources far removed from pollution and contamination.

5.    Fourth, because they are so highly protected, mineral waters are not subject to intense treatment, processing and/or purification.

6.    Knowing that mineral water costs significantly more than other types of

water, unscrupulous sellers are not reluctant to pass off basic groundwater as mineral water, resulting in physical and economic harm.

7.    As the global center of mineral water production, the European Union ("EU") was first to adopt standards to distinguish it from other waters..[1]

8.    The EU required that mineral water (1) originate "in an underground water table or deposit," which ensured it was "microbiologically wholesome" without more than minimal treatment or purification and (2) contain steady levels of "mineral content, trace elements or other constituents."

9.    The Federal Food, Drug and Cosmetic Act ("FFDCA") followed the European standard so Americans got the quality and purity they expected from this unique beverage. 21 U.S.C. § 301 *et seq*.

10.    The Food and Drug Administration ("FDA") defined mineral water similarly, albeit requiring "not less than 250 parts per million (ppm) total dissolved solids (TDS)." 21 C.F.R. § 165.110(a)(2)(iii).

11.    Mineral water must "originat[e] from a geologically and physically protected underground water source," and is "distinguished from other types of water by its constant level and relative proportions of minerals and trace elements at the point of emergence from the source," without any minerals added. 21 C.F.R. §

---

[1]  Directive 2009/54/EC of the European Parliament and of the Council on the exploitation and marketing of natural mineral waters.

165.110(a)(2)(iii).

12.   As home to the most famous mineral springs, New York adopted these standards to protect its citizens.[2]

## II.   PERRIER NATURAL MINERAL WATER

13.   To appeal to consumers seeking mineral water, Nestle USA Inc. ("Defendant") markets "Sparkling Natural Mineral Water," "Natural Mineral Water," and "Flavored Carbonated Mineral Water" under the Perrier brand ("Product").



---

[2] Chapter VI, Food Control, Subchapter C, Food and Food Products (Article 17, AGM), 1 N.Y.C.R.R. § 250.1 *et seq*. (adopting FDA standards of identity for foods and beverages including bottled waters); 1 N.Y.C.R.R. § 259.1(a) (adopting Parts 100, 101, 102, of Title 21).






14.   The labeling and packing proclaims, "Water Captured at the Source in France," with pictures of what appear to be the naturally occurring bubbles from the famous Perrier spring.

15.   However, reports from the capital of mineral water, France, revealed

consumers of Perrier did not get the mineral water they bargained for.[3]

A. <u>Mineral Water Scandal</u>

16.   In late 2020, a whistleblower with Sources Almas, a bottler of mineral water, reported unauthorized practices to the French Directorate General for Competition, Consumer Affairs and Fraud Control ("DGCCRF").[4]

17.   The DGCCRF opened an investigation, culminating in a raid on December 10, 2020, reported in the regional newspaper *La Montagne*.

18.   The DGCCRF investigation discovered the use of practices inconsistent with regulations for the sale of mineral water.

19.   According to *Le Monde*, the DGCCRF then investigated suppliers of the microfiltration and/or other treatment systems used by Alma.

20.   Those records revealed that the use of these unauthorized practices was extensive, including by Nestle and its Perrier brand.

21.   Shocked by its findings, in July 2021, the DGCCRF "extend[ed] [their] investigation to the microfiltration practices of operators in the sector,"

22.   By November 2021, the General Inspectorate of Social Affairs ("IGAS")

---

[3] News Wires, Almost a third of French bottled water brands use banned purification methods, France 24, Jan. 30, 2024; Radio France Internationale ("RFI"), Nestlé admits to treating bottled mineral water in breach of French regulations, RFI, Jan. 29, 2024.
[4] French prosecutors to investigate Nestlé over mineral water treatments, Le Monde, Jan. 31, 2024.

and regional health agencies ("ARS") began inspecting all mineral water bottling plants in France.

23.   At Nestle plants, the inspectors discovered that they were "deliberately misled during previous inspections," and "mentioned filters hidden in electrical cabinets, health checks on raw water falsified by measurements taken after passing through UV and activated carbon treatments, and so on."

24.   A magistrate confirmed that "Nestlé did indeed use illegal filtration systems, and its natural mineral waters lost their status as natural mineral waters. This amounts to deception."

25.   Investigations in France are ongoing.

26.   The advocacy group Foodwatch France has taken Defendant to court to hold it accountable to the French public for what it describes as a "massive fraud," through "use of treatment products and processes which modify the composition of water in its essential constituents," and "absence of mention of treatments on the labeling," among other things.[5]

B.   <u>Source Not Adequately Protected as Required for Mineral Water</u>

27.   The Product is "misbranded" and misleading because "it purports to be or is represented as a food for which a definition and standard of identity has been

---

[5] Foodwatch France, <u>Massive fraud: Foodwatch takes water companies to court</u>, Feb. 21, 2024.

prescribed by regulations," through statements including "Sparkling Natural Mineral Water," "Natural Mineral Water," and "Flavored Carbonated Mineral Water," yet does not conform to the standard of identity for mineral water. 21 U.S.C. § 343(g); AGM § 201(7).

28.   This is because its underground water source at Vergèze is no longer protected.

29.   The reports indicated that its sources are or may be regularly contaminated microbiologically, by bacteria such as *Escherichia coli*, coliform bacteria, enterococci, and traces of chemical pollutants, such as pesticide metabolites.

30. IGAS documented "non-compliant treatments…[which included] microfiltration below 0.8 µm (micron threshold), [] activated carbon [filters] [,] ultraviolet ('UV') [light]," "injection of iron sulfate," and "water disinfection with ozone."

31.   None of the treatment methods applied are necessary when mineral water originates from a protected underground source.

32.   Instead, such measures are taken to treat and process water from lower quality sources to disinfect it prior to being consumed.

33.   However, buyers of mineral water do not expect it to undergo similar treatments to tap water, considering its significantly higher cost.

34.   The reports in the French press have indicated that the "minerality" of the water at issue was no longer consistent, which is contrary to the standards for mineral water.

35.   Defendant acknowledged "there had been changes in the environment around its sources, which can sometimes make it difficult to maintain stability of vital characteristics in the water – namely the absence of pollution and mineral composition."[6]

36.   Defendant stated that "The evolution of climatic and environmental conditions, with the multiplication of extreme events, such as droughts or floods, combined with the expansion of human activities around our sites, makes it very difficult to maintain stability essential characteristics of a natural mineral water."

37.   The FDA has stated that when the natural mineral water at source becomes polluted and no longer meets the microbiological criterion for human consumption, all operations leading to the commercial sale should be suspended.

C. <u>Alleged Blends of Mineral and Non-Mineral Water</u>

38.   The Product is "misbranded" and misleading because "it purports to be or is represented as a food for which a definition and standard of identity has been prescribed by regulations," yet does not conform to the standard of identity for

---

[6] Is Nestlé using processes in its natural mineral waters contrary to applicable regulations?

mineral water. 21 U.S.C. § 343(g); AGM § 201(7).

39.   The *Le Monde* investigation revealed that authorities uncovered "Unauthorized water blends from several sources operated by the same plant," and "occasional mixtures with 'mains water' (in other words, tap water)."

40.   The addition of non-mineral water to mineral water results in it no longer meeting the FDA definition of mineral water, even though it remains "bottled water."

41.   As an example, the FDA considered "if artesian water is blended with spring water to reduce the water hardness, the product is 'bottled water' or 'drinking water,' although its labeling may state the percentages of the artesian water and spring water it contains."

D. <u>Misleading Natural Mineral Water</u>

42.   The Product is "misbranded" and misleading because its descriptions as "Sparkling Natural Mineral Water," and "Natural Mineral Water" are "false or misleading in any particular." 21 U.S.C. § 343(a); AGM § 201(1).

43.   Consumers understand "natural" in the context of mineral water to mean (1) the water has not been blended or manipulated in any fashion with surface or municipal water sources, (2) that because of the water's inherent purity and geological protection, disinfection is not necessary to ensure its safe consumption, and (3) the water will have only been subject to limited processing and treatment

methods, relative to other types of water which cost significantly less.

44.   For example, the Codex Standard for Natural Mineral Waters permits decantation or filtration but only for separation of unstable elements, contrary to the purposes allegedly applied by Defendant.

E.   Additional Treatment

45.   The Product is "misbranded" and misleading because the labeling of "Sparkling Natural Mineral Water," "Natural Mineral Water," and "Flavored Carbonated Mineral Water," with the statement, "Water Captured at the Source in France," next to what appear to be the naturally occurring bubbles from the Perrier source fails to reveal that the mineral water is subjected to unexpected treatments, which are typically applied only to waters of lower quality, inconsistent with what is expected of mineral water. 21 U.S.C. § 321(n).

46.   The FDA has confirmed that significant alterations to the source water for mineral water are material facts which must be disclosed on the label, because it is no longer unmodified ground water and differs significantly from the water that was harvested.

47.   This information would be required to be disclosed on the labeling as part of its statement of identity.

48.   As a result of the false and misleading representations and omissions identified here, the Product is sold at a premium price, at or around $2.49 for 16.9

ounces, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

## JURISDICTION

49.   Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

50.   The aggregate amount in controversy exceeds $5 million, including any statutory or punitive damages, exclusive of interest and costs.

51.   Plaintiff is a citizen of New York.

52.   Defendant is a citizen of Delaware based on its incorporation.

53.   Defendant is a citizen of Virginia based on its principal place of business.

54.   The class of persons Plaintiff seeks to represent includes persons who are citizens of a different state from which Defendant is a citizen.

55.   The members of the proposed class Plaintiff seeks to represent are more than one hundred, because the Product has been sold at grocery stores, big box stores, bodegas, gas stations, warehouse club stores, drug stores, convenience stores, specialty grocery stores, ethnic food stores, and/or online in this State and online to citizens of this State.

56.   The Court has jurisdiction over Defendant because it transacts business within New York and sells the Product to consumers within New York from grocery

stores, big box stores, bodegas, gas stations, warehouse club stores, drug stores, convenience stores, specialty grocery stores, ethnic food stores and/or online in this State and online to citizens of this State.

57.   Defendant transacts business in New York, through the sale of the Product to citizens of New York from grocery stores, big box stores, bodegas, gas stations, warehouse club stores, drug stores, convenience stores, specialty grocery stores, ethnic food stores and/or online in this State and online to citizens of this State.

58.   Defendant has committed tortious acts within this State through the distribution and sale of the Product, which is misleading to consumers in this State.

59.   Defendant has committed tortious acts outside this State by labeling, representing and selling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, amount and/or quality, by regularly doing or soliciting business, or engaging in other persistent courses of conduct to sell the Product to consumers in this State, and/or derives substantial revenue from the sale of the Product in this State.

60.   Defendant has committed tortious acts outside this State by labeling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, amount and/or quality, through causing the Product to be distributed throughout this State, such that it expects or should

reasonably expect such acts to have consequences in this State and derives substantial revenue from interstate or international commerce.

## VENUE

61.   Venue is in this District with assignment to Central Islip Division because a substantial or the entire part of the events or omissions giving rise to these claims occurred in Nassau County, which is where Plaintiff's causes of action accrued.

62.   Plaintiff purchased, used and/or consumed the Product in reliance on the labeling and packaging identified here in Nassau County.

63.   Plaintiff first became aware the labeling and packaging was false and misleading in Nassau County.

64.   Plaintiff resides in Nassau County.

## PARTIES

65.   Plaintiff Kevin O'Rourke is a citizen of Nassau County, New York.

66.   Defendant Nestle USA Inc. is a Delaware and Virginia corporation.

67.   Defendant produces, markets, labels and distributes canned soups.

68.   Defendant Nestle USA, Inc., is a Delaware corporation with a principal place of business in Virginia.

69.   Perrier is a French brand of mineral water with its source at the naturally carbonated Vergèze spring in the Gard département.

70.   Perrier is synonymous with purity and the highest standards for mineral water.

71.   Perrier is known for its naturally tangy flavor, with low mineral and salt content.

72.   Plaintiff is like most consumers who like mineral water, for reasons including its expected quality and purity, presumably because it was fundamentally different from other water types which were more susceptible to pollution and contamination.

73.   Plaintiff is like all consumers who look to the front label of products they buy to see what they are buying and to learn basic information.

74.   Plaintiff is like all consumers and is accustomed to the front label of packaging telling them significant information about the foods they buy.

75.   One of the most important features Plaintiff considers is a product's name and description.

76.   Plaintiff expected that the Product, labeled as "Sparkling Natural Mineral Water," "Natural Mineral Water," and "Flavored Carbonated Mineral Water," described as "Water Captured at the Source in France," with pictures of what appear to be the naturally occurring bubbles from the famous Perrier spring, meant water that was protected from pollution and contamination, such that it would not need to be processed with treatments typically applied to lower qualities of water.

77.   Plaintiff read, saw and relied on "Sparkling Natural Mineral Water," "Natural Mineral Water," and "Flavored Carbonated Mineral Water," described as "Water Captured at the Source in France," with pictures of what appear to be the naturally occurring bubbles from the famous Perrier spring, to expect what he was buying (1) was not subjected to treatments and disinfection measures typically applied to lower qualities of water, which were not protected from contamination and/or pollution, (2) was entirely mineral water instead of a blend with different types of waters, and (3) was a natural mineral water.

78.   Plaintiff purchased the Product between February 2021 and February 2024, at grocery stores, big box stores, bodegas, gas stations, warehouse club stores, drug stores, convenience stores, specialty grocery stores, ethnic food stores and/or online, in Nassau County, and/or other areas.

79.   Plaintiff bought the Product at or around the above-referenced price.

80.   Plaintiff paid more for the Product than he would have had he known  (1) it was subjected to treatments and disinfection measures typically applied to lower qualities of water, which were not protected from contamination and/or pollution, (2) was not entirely mineral water instead of a blend with different types of waters, and (3) was not a natural mineral water, as he would not have bought it or would have paid less.

81.   The Product was worth less than what Plaintiff paid, and he would not

have paid as much absent Defendant's false and misleading statements and omissions.

## CLASS ALLEGATIONS

82. Plaintiff seeks to represent the following class:

> All persons in New York who purchased the Product in New York during the statutes of limitations for each cause of action alleged.

83. Excluded from the Class are (a) Defendant, Defendant's board members, executive-level officers, and attorneys, and immediate family members of any of the foregoing persons, (b) governmental entities, (c) the Court, the Court's immediate family, and Court staff and (d) any person that timely and properly excludes himself or herself from the Class.

84. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

85. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

86. Plaintiff is an adequate representative because his interests do not conflict with other members.

87. No individual inquiry is necessary since the focus is only on Defendant's

practices and the class is definable and ascertainable.

88.   Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

89.   The class is sufficiently numerous and includes several thousand people.

90.   This is because Defendant sells the Product to consumers through hundreds of third-party retailers and online in the State Plaintiff is seeking to represent.

91.   Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

## CAUSES OF ACTION

### COUNT I
New York General Business Law ("GBL") §§ 349 and 350

92.   Plaintiff incorporates by reference paragraphs 1-48.

93.   The purpose of the GBL is to protect consumers against unfair and deceptive practices.

94.   The GBL considers false advertising and deceptive practices in the conduct of any trade or commerce to be unlawful.

95.   Violations of the GBL can be based on the principles of the Federal Trade Commission Act ("FTC Act") and FTC decisions with respect to those principles. 15 U.S.C. § 45 *et seq*.

96.   In considering whether advertising is misleading in a material respect,

the FTC Act recognizes that the effect of advertising includes not just representations made or suggested by words and images, but also the extent to which [it] fails to reveal facts material in the light of such representations. 15 U.S.C. § 55(a)(1).

97.   Defendant's false and deceptive representations and omissions with respect to the Product's natural qualities and attributes are material in that they are likely to influence consumer purchasing decisions.

98.   Plaintiff paid more for the Product than he would have had he known (1) it was subjected to treatments and disinfection measures typically applied to lower qualities of water, which were not protected from contamination and/or pollution, (2) was not entirely mineral water instead of a blend with different types of waters, and (3) was not a natural mineral water.

99.   The Product's labeling and packaging violated the FTC Act and thereby violated the GBL because it expressly states (1) it is a natural mineral water and (2) it is mineral water in accordance with relevant federal and state standards, when this is false and/or misleading.

100. The Product's labeling and packaging violated the FTC Act and thereby violated the GBL because it impliedly suggests

101. (1) it was not subjected to treatments and disinfection measures typically applied to lower qualities of water, which were not protected from contamination and/or pollution, (2) was entirely mineral water instead of a blend with different

types of waters, and (3) was a natural mineral water, when these statements, images and/or their implications are false and/or misleading.

102. The labeling and packaging of the Product violated the FTC Act and thereby violated the GBL because "Sparkling Natural Mineral Water," "Natural Mineral Water," "Flavored Carbonated Mineral Water," described as "Water Captured at the Source in France," with pictures of what appear to be the naturally occurring bubbles from the famous Perrier spring, created the erroneous impression it was protected from pollution and contamination, such that it would not need to be processed with treatments typically applied to lower qualities of water.

103. Violations of the GBL can be based on public policy, established through statutes, law or regulations.

104. The labeling of the Product violates laws, statutes, rules and regulations that are intended to protect the public.

105. The labeling of the Product violated the GBL because the representations and omissions are misleading.

106. The labeling of the Product violated the GBL because the representations and omissions of "Sparkling Natural Mineral Water," "Natural Mineral Water," "Flavored Carbonated Mineral Water," described as "Water Captured at the Source in France," with pictures of what appear to be the naturally occurring bubbles from the famous Perrier spring, was contrary to relevant federal and state standards and

their regulations, which prohibit consumer deception.

107. These include the following federal and state laws and regulations, described above.

| Federal | State |
|---------|-------|
| 21 U.S.C. § 321(n) | AGM § 201(1) |
| 21 U.S.C. § 343(a) | AGM § 201(7) |
| 21 U.S.C. § 343(g) | 1 N.Y.C.R.R. § 250.1(a)(14) |
| 21 C.F.R. § 165.110(a)(2)(iii) | 1 N.Y.C.R.R. § 259.1(a) |

108. Plaintiff believed the Product (1) was not subjected to treatments and disinfection measures typically applied to lower qualities of water, which were not protected from contamination and/or pollution, (2) was entirely mineral water instead of a blend with different types of waters, and (3) was a natural mineral water, even though (a) it was subjected to treatments and disinfection measures typically applied to lower qualities of water, which were not protected from contamination and/or pollution, (b) was not entirely mineral water instead of a blend with different types of waters, and (c) was not a natural mineral water,

109. Plaintiff seeks to recover for economic injury and/or loss he sustained based on the misleading labeling and packaging of the Product, a deceptive practice under the GBL.

110. Plaintiff will produce evidence showing how he and consumers paid

more than they would have paid for the Product, relying on Defendant's representations and omissions, using statistical and economic analyses, hedonic regression, hedonic pricing, conjoint analysis and other advanced methodologies.

111. As a result of Defendant's misrepresentations and omissions, Plaintiff was injured and suffered damages by his payment of a price premium for the Product, which is the difference between what he paid based on its labeling and marketing, and how much it would have been sold for without the misleading representations and omissions identified here.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Awarding monetary damages and interest;

3. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

4. Other and further relief as the Court deems just and proper.

Dated:   March 4, 2024

Respectfully submitted,

/s/ Spencer Sheehan
Sheehan & Associates P.C.
60 Cuttermill Rd Ste 412

Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com

*Notice of Lead Counsel Designation:*

*Lead Counsel for Plaintiff*

Spencer Sheehan

Sheehan & Associates P.C.

*Counsel for Plaintiff*

**Certificate of Service**

I certify that on March 4, 2024, I served and/or transmitted the foregoing by the method below to the persons or entities indicated, at their last known address of record (blank where not applicable).

|  | CM/ECF | First-Class Mail | Email | Fax |
|---|---|---|---|---|
| Defendant's Counsel | ☐ | ☐ | ☐ | ☐ |
| Plaintiff's Counsel | ☒ | ☐ | ☐ | ☐ |
| Courtesy Copy to Court | ☐ | ☐ | ☐ | ☐ |

/s/ Spencer Sheehan